**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**

| | |
|---|---|
| _____ ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| vs. ) | CASE NO. 1:21-CR-116-MR-WCM |
| ) | |
| ) | |
| CONNIE JAMERSON, ) | |
| [Third-Party ) | |
| Custodian] ) | |
| _____ ) | |

**THURSDAY, JANUARY 16, 2025**
**CONTEMPT HEARING**
**HELD IN ASHEVILLE, NORTH CAROLINA**
**BEFORE THE HONORABLE MARTIN REIDINGER**
**CHIEF UNITED STATES DISTRICT JUDGE**

<u>APPEARANCES</u>:

<u>On Behalf of the Government</u>:

**DON GAST, Assistant U.S. Attorney**
**U.S. Attorney's Office**
**100 Otis Street, Room 233**
**Asheville, North Carolina  28801**

<u>On Behalf of the Defendant</u>:

**ERIC J. FOSTER, Esquire**
**Law Office of Rick Foster**
**9 SW Pack Square, Suite 204 E-4**
**Asheville, North Carolina  28801**

**MICHELLE A. McGIRR, RMR, CRR, CRC**
**Official Court Reporter**
**United States District Court**
**Western District of North Carolina**
**Asheville, North Carolina**

$$I \ N \ D \ E \ X$$

**WITNESS**:

United States Probation Officer Justin Adams

**EXAMINATION**:                                                    **PAGE**

Direct Examination by Mr. Gast                     16
Cross-Examination by Mr. Foster                    19

\*   \*   \*

(Thursday, January 16, 2025)

**P R O C E E D I N G S**

(The third-party custodian, Connie Jamerson, coming forward to counsel table from the gallery at 9:00 a.m.)

(Open Court at 9:01 a.m.)

THE COURT:  Good morning, everyone.

MR. GAST:  Good morning, your Honor.

THE COURT:  We have one matter that's on the calendar for this morning and that is in the case of United States v. Jamerson. The hearing that we have this morning is for -- it's a contempt hearing pursuant to Rule 42 regarding the designated custodian for the defendant.  That custodian being Connie Jamerson.

Mr. Gast, good morning.

MR. GAST:  Good morning, your Honor.

THE COURT:  Is the Government prepared to proceed?

MR. GAST:  We are, your Honor.

THE COURT:  Mr. Foster, good morning to you.

MR. FOSTER:  Good morning.

THE COURT:  Is Ms. Jamerson prepared to proceed?

MR. FOSTER:  We are not prepared to proceed to the contempt hearing.  I'm kind of at a loss as to what this schedule is for.  I've read Rule 42 and I filed the motion to dismiss based on it and it seems like there's -- you know, 42(a)(1)(C) says, state the essential facts -- well, first of all, Rule 42 contemplates that

a contempt proceeding is begun by the Court. This one, I don't know if it was begun by the Court because I didn't get involved until later, but certainly the first documentation I got was from the prosecutor's office and --

THE COURT: Let me stop you because I want to make sure I understand your argument.

First of all, it's not that I'm ignoring your motion to dismiss. That is the first thing that we're going to take up this morning and, of course, if -- there's the potential that it terminates anything that we do beyond that. But if it does not terminate what goes beyond that, then it is my intent to go forward with the hearing.

MR. FOSTER: I'm glad you interrupted -- I'm glad you brought that up because we are ready to proceed on the motion to dismiss, which may have been the question you were asking.

THE COURT: As for the portion that you're mentioning last, namely, how this matter was actually initiated pursuant to Rule 42 -- and of course, as at least as I understand it from reading the record, the Government made a motion that a contempt proceeding go forward and there was a matter that was heard by Judge Metcalf which yielded an order which is the one that you have challenged as the notice under Rule 42.

But, of course, what Judge Metcalf entered isn't -- is an order of this court. So to the extent that there is the necessity that a contempt proceeding be initiated by the Court, the notice

under Rule 42 is that initiation which was issued by Judge Metcalf.

So where's the problem?

MR. FOSTER: That's my understanding as well. The problem that we see is that in -- as I said, 42(a)(1)(C) says to state the time and place of the trial, which Judge Metcalf did. Allow the defendant a reasonable time to prepare a defense, which Judge Metcalf did --

THE COURT REPORTER: To allow the defendant...

THE COURT: Yeah, whenever you're reading -- just like everybody else, whenever you're reading, you speak very, very quickly compared to the way you ordinarily talk and that drives the court reporter absolutely insane.

MR. FOSTER: Allow a defendant a reasonable time to prepare a defense, which Judge Metcalf did. State the essential facts, which Judge Metcalf did, constituting the charged criminal contempt and describe it as such, which I cannot discern from that order.

We do not know -- certainly based on the Government's response, we know the Government's position is that the order of November of 2023 is the order she's charged with violating. That's not entirely clear from Judge Metcalf's document.

If that's the case -- again, the reason I brought up that it's meant to be started by the Court is that this proceeding -- there hasn't been a whole lot of difference to this point between what the prosecutor is doing and what Judge Metcalf is doing. And

unlike a typical criminal charge, which is brought by the Department of Justice, and is meant to be described by the defendant as such by the Department of Justice, a contempt charge -- our position is Rule 42 is clear, that is to be described by the Court, and I don't -- I can't discern from Judge Metcalf's order exactly what he believes is contemptuous.

In fact, I can't discern from that order that the order he's talking about is the November 2023 -- his order of November 2023, although the Government is proceeding as though that is. That is certainly the most likely one. And if that is the case, I guess she is charged in some general way with violating the terms that have order. But, again, I cannot discern from Judge Metcalf's document how she is deemed by him to have violated the terms of that order.

THE COURT: Well, and I managed to glean all of what you just expressed from the motion that you filed. Having read multiple times Judge Metcalf's order, I believe that it goes into substantial detail as to the alleged transgressions of Ms. Jamerson and gives notice not only of the particular action of the Court that was supposedly violated, namely, the order of November the 22nd, 2023, but also the multifaceted manner in which she was allegedly in violation of that order.

It struck me in what you filed in your motion to dismiss that the main complaint you were making is that there wasn't one particular manner in which Ms. Jamerson was being accused of

violating the November '23 order, it was that there were multiple manners in which she was being accused of violating the November '23 order and that you were asserting that that somehow is impermissible under Rule 42.

Am I missing something?

MR. FOSTER:  I think the Rule 42 notice has to provide the defendant notice of what they are charged with and simply saying something is multifaceted does not do that.  Simply reciting what the magistrate says she did factually does not do that.

Explaining how what she did violated the order that the magistrate believes her to have violated would do that.  I don't believe Judge Metcalf's order even specified which order he was talking -- by order, I'm confusing -- Judge Metcalf's document that started this case.  I can't discern from that what the Government says is clear that it's the November 2023 order that she's charged with violating, and certainly nowhere in that order --

THE COURT:  If it's not that, then what else could it be?

MR. FOSTER:  Well, that's -- that's a fair point except that the Government has, throughout this case, said that all of these actions that happened that were not subject to this order are violations of this order.

Now, if they can prove that, they can prove that, but the defendant has to have notice of what the allegations are.  And I don't see in Judge Metcalf's document any description of how what Ms. Jamerson -- what he believes she did is violative of the

November 2023, order which make it very hard to defend at a hearing.

If you -- in a typical case, you have an indictment and it tells you -- well, in this case we do have the statute number she's accused of violating and he correctly listed the elements of that statute. But you have a description of conduct in an indictment that is simply not present here -- well, the description of conduct is, but the description of how that conduct violates the law, which is typically in an indictment, is simply not present.

We'll do the best we can if we have -- I mean, obviously we know -- we've had plenty of notice of what the Government's evidence is so I guess we'll hear for the first time today what -- how that violated the law. I don't think that's the procedure contemplated by Rule 42.

THE COURT: Well, Mr. Gast, do you want to say anything in response in supplement to what you filed?

MR. GAST: I don't think it's necessary unless the Court has questions.

THE COURT: Well, the way that I look at this is -- again, I read Judge Metcalf's December order multiple times. I also read the November '23 order on the bond multiple times. And it seems to me that Judge Metcalf's December order goes into a great deal of detail to where there is no question that the order that is allegedly violated is the November '23 order.

And that in going through the facts that are alleged, that Judge Metcalf's December order goes into a great deal more

particularity than you ordinarily find in an indictment from which it is easily gleaned how the actions of Ms. Jamerson are allegedly in violation of the November '23 order. And as such, it strikes me that the gist of the argument on behalf of Ms. Jamerson is that Rule 42 requires a greater degree of particularity than is required of an indictment for which I see no authority. So on that basis, the motion to dismiss is denied.

I think that the December order from Judge Metcalf gives fully adequate notice under Rule 42 of not only what actions of Ms. Jamerson are allegedly contemptuous, but what order they are contemptuous of as well as the manner in which they are allegedly in violation of the November 23 order. If anything -- well, I'll leave it at that.

So for those reasons, the motion to dismiss is denied.

So are the parties prepared to proceed with the contempt hearing in accordance with Judge Metcalf's December order?

MR. GAST: The Government is ready, your Honor.

THE COURT: Mr. Foster.

MR. FOSTER: No, sir. There still is the second grounds for the motion to dismiss, which is that our -- the question of whether -- Judge Metcalf found no facts prior to February 1st, 2024, and the question of whether that order was even in effect after February 1st, 2024, is a matter of law that the Court can decide without hearing any evidence.

THE COURT: Well, again, on that point, as to what the

facts are and what the Government can prove of the allegations that are set forward, I need to hear the evidence. So I don't see how I can dispose of that issue without hearing the evidence.

I suppose I can deny your motion on that ground without prejudice to you arguing it as the evidence being inadequate, but the assertion of what it is that Ms. Jamerson has allegedly done that is in violation of the November '23 order and whether it comes within the purview of that order is dependent upon that evidence, at least the way I see it. So I need to hear the evidence in order to rule on that particular point that you've made in your motion.

So with that, Mr. Gast, how are we going to proceed? Do you have your witnesses present for presenting the evidence in this matter?

MR. GAST: Well, your Honor, I believe all the evidence is actually already in. We had a hearing in front of Judge Metcalf and all of the exhibits have been entered. The only issue is the publication of them to this Court.

I provided the Court with a notebook that has the exhibit list of the items that were introduced into evidence and copies of Government's Exhibits 1, 2, 3, 4 and 8. And those are just paper copies.

I'll go through them for purposes of the record. Exhibit 1 is the release order or Document No. 29 in ECF.

Document No. 2 --

THE COURT: Well, let me stop you for a moment though.

Procedurally, you say all of these -- these exhibits are already in evidence, but procedurally to the extent that Rule 42 calls for a contempt hearing, is there anything that is in evidence for that Rule 42 proceeding?

There was what you presented in order for having Judge Metcalf enter an order that initiates the proceeding, but as for the Rule 42 hearing itself, is there anything in the record yet?

MR. GAST: Well, certainly this is an unusual proceeding and so there's not a well worn path. What I will say is that, you know, Judge Metcalf and the magistrate court is an arm of this Court and so in that sense, any evidence I've already offered before Judge Metcalf is already before this Court. It is all the District Court.

I'm happy to reintroduce it if -- before this Court if that's the procedure the Court prefers. I don't have a strong preference or inclination either way. And the order from Judge Metcalf itself sets forth a lot of the facts. And almost everything that we're going to offer today is our items that the Court could just take judicial notice of because they are ECF entries or orders that this Court has given.

For example, I would ask the Court -- with respect to Mr. Foster's last assertion or question or -- you know, this Court can take judicial notice of the fact that this Court ordered the extension of the bond order when the Court revoked Steven Jamerson, the defendant's supervised release and then permitted him to remain out on bond and then ordered the continuation of the same conditions

of bond. So that would be something this Court could take judicial notice of.

I'm happy to handle the hearing however the Court wants to. But the Government's position is, yes, it is all already in evidence because it's already been presented to the Court through its agent, the Magistrate Judge.

THE COURT: Well, Mr. Foster, what do you say about the procedural question as to what we are supposed to do as part of this hearing?

MR. FOSTER: I don't object to this Court accepting as -- the facts as found by the Magistrate Judge. To the extent that the Government wants to add anything else, I think that they probably have the right at this hearing. But if what Mr. Gast is saying is that the facts as found by the Magistrate Judge are the facts upon which this Court is going to make its decision, we're fine with that.

THE COURT: Well, with that stipulation, then, is there any additional evidence that the Government is planning to present other than the facts as found by Judge Metcalf in his December order?

MR. GAST: Well, your Honor, we intend to play Government's Exhibit 6, 7 -- I'm sorry, 5, 6 and 7. Again, the Government's contention is they're already in evidence. We're simply publishing them to this finder of fact.

And just so the record is clear, Government's Exhibit 5

and 6 constitute -- they're separated into two digital files, but they're basically the same exhibit, which is an interview of Ms. Jamerson, the custodian, at her home conducted by the probation officer and at times the Marshal that was looking for the defendant. That's already been admitted into evidence and is referenced in Judge Metcalf's order.

My understanding is that the Court has not viewed that. So my suggestion is we'll play those two files in totality before the Court today.

And then Government's Exhibit No. 7 is -- also is introduced into evidence already. It is an audio file -- I should state the dates. I'm sorry. The date of the interview, which is Government's Exhibit 5 and 6, the video interview, is April the 11th of 2024. Just to square that with the Court's understanding.

So March 26th was the date at which Mr. Jamerson, the defendant, was to surrender to the Bureau of Prisons and did not. On April the 10th is the incident that's referenced in Judge Metcalf's order where the defendant, Mr. Jamerson, was already on state -- he was on state probation as well. And State Probation Officer Tyler Stafford went to the custodian and defendant's home to find the defendant and that's when the defendant took flight and then there was a chase and then he got away and things like that.

So the following day is April the 11th, 2024. That's the date of this video where the probation officer and one of the U.S. Marshals was interviewing Ms. Jamerson about the flight of her son.

So that's the date of that exhibit.

And then the audio interview of Steven Jamerson was conducted by his probation officer and that was on May 17th of 2024 in custody -- in Madison County in state custody.

So what I would propose is to play those three things. To the extent that I need to move into evidence all of Government's Exhibits 1 through 8, I will do so at this time, although, again, the Government's position is they're already before the Court.

THE COURT: Any objection to that, Mr. Foster?

MR. FOSTER: No objection to their introduction, I guess. I don't -- I mean, Judge Metcalf made what he believed to be the relevant -- findings of relevant fact based on those recordings. I guess I don't have any way of preventing him from playing them again, but it seems unnecessary.

THE COURT: Okay. Mr. Gast, you may proceed with your presentation.

MR. GAST: All right. Your Honor, then at this time we would ask the Court's permission to play Government's Exhibit 5.

And I'll ask the clerk if you'll handle volume. I've got it on basically full volume on the laptop but...

And just let me know if you have any difficulty hearing, please.

MR. FOSTER: Your Honor, if I may -- I'm sorry to interrupt. I'm just looking at this -- I do have an objection just to the single exhibit, which is Exhibit 4, which is a police report.

That's -- all of the others are -- we don't have any objection to their admissibility, but as to Exhibit 4, that is simply a written report.

THE COURT: Okay. Well, since we're moving on to Exhibit 5 -- let's view Exhibit 5 and then we'll come back to your objection on 4 as to whether that should be excluded.

MR. GAST: Shall I resume?

THE COURT: You may.

MR. GAST: Thank you, your Honor.

**(Video with audio played in open court commencing at 9:25 a.m.)**

**(Video concluded)**

MR. GAST: With the Court's permission then, I'll go ahead and resume and play Government's Exhibit 6, which is part two of this video.

THE COURT: You may proceed.

**(Video with audio played in open court commencing at 10:01 a.m.)**

**(Video concluded)**

MR. GAST: Your Honor, the next item that the Government has to play for the Court is Government's Exhibit No. 7. It's audio only. It's the interview -- custodial interview of Steven Jamerson from May 17th of 2024. My recollection is it's about 40, 45 minutes long for planning purposes.

THE COURT: You may proceed.

MR. GAST: Okay.

**(Audio played in open court commencing at 10:18 a.m.)**

**(Video concluded)**

THE COURT:  Will there be any other evidence for the Government?

MR. GAST:  Your Honor, I'd like to call Officer Justin Adams very briefly, like 5 minutes or less.

THE COURT:  Okay.  Come forward to be sworn.

MR. GAST:  Call Officer Adams.

COURTROOM DEPUTY:  Place your left hand on the Bible and raise your right.

**UNITED STATES PROBATION OFFICER JUSTIN ADAMS**

having been duly sworn, testified as follows:

THE WITNESS:  I do.

THE COURT:  You may proceed.

MR. GAST:  Thank you, your Honor.

**DIRECT EXAMINATION**

BY MR. GAST:

Q.    Good morning.

A.    Good morning.

Q.    If you would just state your full name and your occupation for the record, please.

A.    My name is Justin Adams.  I am a Senior United States Probation Officer for the U.S. District Court in the Western District of North Carolina.

Q.    All right.  And are you the officer that was in charge of supervising Steven McClain Jamerson?

A. I was.

Q. And was that you that made the recordings that we've just played for the Court this morning?

A. It was.

Q. And were you here for the playing of all those recordings this morning?

A. I was.

Q. Okay. Most of the things I would want to ask you I've already asked you in the magistrate judge court level and has been incorporated into the magistrate court's orders so I won't retread that ground, but I just want to ask you a few questions very briefly.

Connie Jamerson, seated here, was the custodian that was supposed to call you if anything went wrong with Steven Jamerson's supervision; is that correct?

A. Yes; that's correct.

Q. Did she ever call you at any time to tell you that Steven Jamerson was using drugs?

A. No.

Q. Did she ever call you to tell you that he was absconding from her supervision, that is, leaving her home and not telling her where she [as said] was going to be and being gone for days at a time?

A. No.

Q. Did she call to report to you that he -- that he being

Steven Jamerson -- did not report to BOP as directed on March 26th of 2024?

A.   No.

Q.   Did she call you to tell you that he fled on foot from a North Carolina probation officer on April the 10th of 2024?

A.   No.

MR. FOSTER:  Your Honor, I believe he's testified she never called him.

MR. GAST:  I'm getting to that.

THE COURT:  Is that an objection?

MR. FOSTER:  Yes.

THE COURT:  Basis of the objection?

MR. FOSTER:  Relevance.  It's just repetitive.

THE COURT:  Well, get to the point, Mr. Gast.

Q.   (By Mr. Gast)  Did she ever call you about anything, any violation?

MR. FOSTER:  Objection.  Waste of time.

THE COURT:  Well, overruled.

Get to the point, Mr. Gast.

A.   No.

Q.   (By Mr. Gast)  And when I say, call, I don't want to imply that I'm just talking about telephone.  Did she contact you about any of the things I've just asked you about by any means?  Letter, email, text, FaceBook messenger, any form of communication?

A.   No.

Q.     Thank you.

MR. GAST:  Those are all my questions.

THE COURT:  Cross-examination.

**CROSS-EXAMINATION**

BY MR. FOSTER:

Q.     Mr. Adams, you talked to Steven Jamerson and he told you about his mother's mental infirmities.  Did you ever do any investigation of that?

A.     No.

Q.     After you spoke with her out at her house and she appeared confused as she did on the video, did you ever do any investigation about her mental health history?

A.     No.

Q.     Did you ever do any investigation about how far she went in school?

A.     No.

Q.     When Steven Jamerson described his mother to you in the way he did regarding her understanding of the world, did you ever investigate whether what he was saying -- the details of what he was saying?

A.     No.

MR. FOSTER:  That's all I have.

THE COURT:  Any redirect?

MR. GAST:  No, your Honor.

THE COURT:  Okay.  Thank you, Officer Adams.  You may

step down.

(Witness Excused)

THE COURT: Before we move on, I don't want to forget this issue regarding the objection to the admission of Government's Exhibit 4.

MR. FOSTER: We'll withdraw the objection.

THE COURT: Any other evidence, Mr. Gast?

MR. GAST: No, your Honor.

THE COURT: Mr. Foster, are you planning to present any evidence on behalf of Ms. Jamerson?

MR. FOSTER: May I have a moment?

(Attorney Foster conferring with Connie Jamerson at counsel table briefly off the record)

MR. FOSTER: No, your Honor. We're not going to present any evidence.

THE COURT: Rather than moving directly to any arguments on this point, we've been at this for a little bit more than two hours, so let's go ahead and take the morning break at this time. Then I'll come back and hear the arguments of both sides regarding whether or not the Government has proven criminal contempt, indirect criminal contempt, and anything else that needs to be heard at that time.

So, Marshal, 15 minutes, please.

(Recess commencing at 11:05 a.m. and concluding at 11:25 a.m.)

(Open Court at 11:25 a.m.)

THE COURT: Well, Mr. Gast, let me start with you. I want to hear what you believe you have proven beyond a reasonable doubt as to the contempt of Ms. Jamerson. And particularly, how has she been given fair notice of such in Judge Metcalf's December order.

MR. GAST: Okay. Does the Court have a preference as to which order I would address those two things?

THE COURT: Well, it seems like for each point you need to address both so...

MR. GAST: Okay.

THE COURT: But other than that, I'll hear and you whatever order you want to give me.

MR. GAST: All right. Well I'll start first just broadly about notice and what's required under the rule. And I don't want to restate too much what I put in my response to the defense motion to suppress -- or motion to dismiss, excuse me, but a couple of things about that broadly speaking.

One is that the rule itself does not require a lot in terms of notice. I think the intention of the rule is simply to prevent a defendant walking in and being entirely surprised that they are subject to a contempt hearing. That is simply not the case here.

The *Linney* case that I cited in the Government's response to the motion to dismiss talks about that. In fact, notice there was kind of one of the primary issues. And the Fourth Circuit and

that case essentially said, you know, we're trying to make sure they have fair notice. But other than that, there's not particular requirements or --

THE COURT: Let me refine my question as to notice.

MR. GAST: Okay.

THE COURT: In other words, I do not see that there is fair notice in a situation where the notice document -- here, the December order -- identifies potential or asserted contempt of A, B and C and then the Government comes in and proves X, Y and Z. In other words, anything that you are advocating that you have proven beyond a reasonable doubt that constitutes contemptuous action, you have to be able to point to something in Judge Metcalf's December order that says, this is where the defendant has been given fair notice that that's something she needed to defend.

MR. GAST: Okay. Thank you for that clarification. I will -- I respectfully disagree slightly because I think the law doesn't quite require that.

And so backing up to speaking broadly again, I think the rule simply requires the defendant -- the Court to give the defendant sufficient notice and adequate time to prepare a defense that she's being held in contempt. I don't think any of the rules require that level of particularity. However, I think that even if that were the standard, I think that level of particularity has been given.

As the Court noted in his question to Mr. Foster early on

in this proceeding, there's only one order to which Ms. Jamerson, the custodian, is subject. There's been no other order. So there can be no confusion over what order she's been given and over what order she has acted with contempt. And that is Government's Exhibit No. 1, which is Document No. 29 in ECF. That's the release order for her son, Steven McClain Jamerson.

So in the broadest of sense, there's no mystery as to what it is her -- she -- about what order her conduct is in question. That document requires basically three things of her and that's -- it requires her, A, to supervise the defendant in accordance with all the conditions of release. It requires, B, to use every effort to assure the defendant's appearance at all scheduled court proceedings. And, C, to notify the Court immediately if the defendant violates any condition of release. Those are the three things that are required of her.

And I would also note that the Court in its follow-up instruction to me about my argument, said that I have to be able to point to where in Judge Metcalf's order particular notice was given. And, again, I would quibble with that. I don't think the rules require that either.

I think that, in fact, the rule itself is very broad about the type of notice and the form it can be. It can be a statement in open court, it can be a filing, it can be -- I'm trying to remember what the other one is, there was three different ones in there. So I don't think there's any support in the law for the

suggestion that if it's not in Judge Metcalf's order of Document No. 50, I believe it was...

THE COURT: Yes, 50.

MR. GAST: 50, yes. That it is out of bounds for this hearing. I would disagree with that proposition.

Nevertheless, even with that disagreement, I think almost all of what we talked about today falls within Government's Exhibit -- or, I'm sorry -- the Court's order that the Court's referring to, Document No. 50, with perhaps one brief exception.

The reason I called -- and I'll just -- in full disclosure, the reason I called Officer Adams at the end was because Judge Metcalf's order was very particular about how the defendant or the custodian, rather, did not contact the officer after he failed to report to BOP and also did not contact the probation officer about his flight from the state officers.

That certainly, I think, is obviously and clearly within bounds for the purposes of this hearing but the -- the contempt is actually broader than that because the -- there were many other ways in which she was contemptuous of the order.

And as far as notice of those things, as I responded in Government's response to the motion to dismiss, there have been a number of filings in this case. Any of them which could serve as sufficient notice.

And so, again, since the law -- neither the law nor the rules require that it must be in ECF Document No. 50, I would offer

the Court that any of the filings in this court -- including the Government's filings -- are sufficient to put her on notice of the various ways in which she was contemptuous of this order.

But with respect to the three things that she had to do, the first was to supervise the defendant in accordance with all of the conditions of release. She violated that in at least three ways that I can see.

One is that she -- that he -- the defendant, Steven Jamerson, failed to surrender for his sentence, which is a violation of condition number four, and she did not supervise him with -- according to that condition nor notify the probation officer.

He was using drugs, which is a violation of condition number one of the order and 7L and she did not report that either despite the -- and Government's Exhibit 5 and 6 it was clear that she was aware of that. She stated -- talked about it a couple of times in the interview.

And lastly she -- that he absconded her supervision. That she stated throughout that interview several different times, you know, he's a grown man, he can take care of himself. What am I supposed to do? Made it very clear that she had no intention of monitoring or watching him with any degree of rigor.

And that Steven Jamerson's interview, he admitted that he had basically left home -- he had been long gone as of March the 18th and not living there hardly at all and that -- and she never disclosed that. So that -- those are the violations of that

provision.

The B provision is to use every effort to assure the defendant's appearance at all scheduled court proceedings and for sentence. And, of course, she -- he got to the -- this Court's revocation hearing, but then didn't surrender, of course, which is the centerpiece of the contempt here.

And part of using every effort to assure it is that she also didn't drive him. And, you know, when asked about that in the interview, she said, well, what I agreed to was if I had a working car, I would do my best, or something along those lines.

And, first, that's not what the order says. But, two, she had a working car at the time and just didn't take advantage of it. There was much debate during that interview in the driveway as to whose car it was and who had access to it, I would submit, because she was being cagey about that.

I'll talk about this when we get to punishment but, you know, the -- one of the reasons they were asking those various direct questions, aside from trying to locate the defendant -- the defendant, Steven Jamerson -- was also because they were trying to gauge whether she was harboring him.

And I will tell the Court, it was a very close call whether to charge her with harboring. I think ultimately we chose not to because we couldn't prove that she gave him the keys that night. But I would submit that, you know, according to the -- based on the interview in Government's Exhibit 5 and 6, there was

substantial question about that, about -- you know, did he flee from the officers and then come back at night and then encounter the custodian and then get the keys from her and then flee, which would be harboring, or did he simply go back to the shed and get the keys unbeknownst to her and take off in the car.

We elected, or I elected, not to have her charged with harboring because we couldn't prove that distinction. So I'm content to with the supposition that he did, in fact, take the keys and go without her knowledge that night.

However, what it does establish though is there was a working vehicle in that family and the -- and neither the defendant nor the custodian met their obligations for getting him to Bureau of Prisons on time.

Lastly, in section C, that she is required to notify the court immediately if the defendant violates any condition of release. And I count at least four broad categories of violations and then, of course, some of them have multiple instances of violation, none of which were reported. At no time did she make any effort to contact Officer Adams about anything.

But the four broad categories of violation are that he absconded from her supervision, apparently often, early and, by and large, completely. That he was using drugs. She indicated in the interview that she was aware of that and didn't report any of that. That he failed to surrender to BOP. And, again, both the defendant and the custodian admitted in their various interviews that both he

and she knew of that obligation and both he and she ignored it.

And lastly, the encounter with law enforcement where he ran from probation, state probation, and the county deputies. They -- she did not make any effort to contact anybody to notify them of that.

So in short, she basically completely abdicated her role as custodian. I think the only evidence of any positive use of her custodial authority was that she provided him an occasional place to stay, which was not the part of the deal.

And indeed, you know, what was discussed in the hearing -- the detention hearing itself was that he was supposed to live in the house. Even living in the shed was a violation of at least the spirit of what was discussed at the release hearing. Now, admittedly the order doesn't specify living in the shed versus living in the house, although it does give the address. And I would submit the address is to the house and not to the shed. But be that as it may, you know, what was discussed at the hearing was he needs to live inside with you.

And during -- in the interview that we played for the Court in full, she couldn't even name more than a time or two where he came in to eat or use the shower. So she clearly completely and almost immediately abdicated that responsibility.

The other thing I can say in her favor is she apparently did notify the defendant, Steven Jamerson, of the BOP report date, just did nothing to make sure that came about.

So her contempt of the order, Government's Exhibit No. 1, Document No. 29, is all but complete. It's clear that she had no intention of complying with it in pretty much any regard.

And I think the interviews that we provided for the Court, that the Court has seen played today, demonstrate that. It also demonstrates her continued caginess, at best, and her basically attempt to be as completely unhelpful as possible in locating him, explaining what happened.

There's the issue about calling the car that he was in white and then later saying it was black and then, you know, a car that she'd owned for years. You know, that's, again, some of the fodder that contributed to our assess -- attempted assessment of whether we should charge with harboring and not just contempt, but -- so her contempt is near total.

In terms of whether she's on sufficient notice of that, again, I don't think we are limited to Document No. 50. I think all of the Government's filings indicated all of those things. We had an evidentiary hearing where all of these things were discussed and I -- again, I don't think that the rule requires that if it's not in document -- Government's -- ECF Document 50 that it's out of bounds.

So I would ask the Court to consider all of it. Even if the Court were to find that there is a rule or the Court just opts to rule that if it's not in Government's -- Document 50 we can't consider it, I think there's ample evidence that was from -- that was noticed in Document 50 about her not reporting the absconding,

not reporting flight from the officers, not reporting the drug use, not reporting the failure to surrender for -- to BOP.

So unless the Court has questions, I'll yield to Mr. Foster. But we ask that the Court find her in contempt and then we'll address punishment after.

THE COURT: Okay. Mr. Foster.

MR. FOSTER: Well, I have a number of points. I hope I don't go on too long, but I do want to address all of them.

Obviously the first one is the subject of the motion to dismiss we filed, which is a -- the very first question is was this order that exists in effect at all after February the 1st.

THE COURT: You're talking about the November '23 --

MR. FOSTER: November 20, '23 order. But this is all in the motion I filed pretrial. It was issued pursuant to 31 -- 18, 3142, which is the release of a defendant before trial. Mr. Jamerson's trial occurred on February 1st, 2024.

You've heard no evidence -- certainly no evidence we were given notice of, but I would say nobody put a date on anything. You heard no evidence of anything that happened prior to February 1st, 2024.

So the very first question is whether the order was in effect at all. Mr. Gast did make a -- in his response, some reference to 18, 3143, which would apply to an order of release pending surrender for sentence, but there's no evidence in -- that such an order ever was given.

And on top of that, even --

THE COURT: Where you say no evidence that such an order was ever given, what is -- what's the form that is required? Are you saying it needs to be a separate document?

MR. FOSTER: There has to be some -- well, to start with, there has to be some separate proceeding because it's a different standard. The Court has to make findings pursuant -- to issue an order under 3143. I don't know that that ever happened in this case.

Part of that is because it was a supervised release hearing so the time between -- the duration of time between trial and sentence was minutes, but after -- at the moment that he was found guilty or responsible on the supervised release violation, the 3142 order is no longer in effect. And if there is going to be a 3143 order, there has to be a proceeding --

THE COURT: So let me make sure that I understand this. So you're saying that when I have a revocation proceeding and the defendant is found responsible and, therefore, receives some sentence and requests to be allowed to self report, at that point there needs to be a separate proceeding under 3143 that -- to make the determination as to whether that will be allowed, even though it has been requested by the defendant and under almost all of the circumstances where it applies, agreed to by the Government. That's your position?

MR. FOSTER: That is my position but --

THE COURT: Well, then -- under those circumstances then, what am I supposed to do? Am I supposed to then remand the defendant to the Marshal to be held pending a detention hearing in front of Judge Metcalf -- that might happen the next day, it might happen the next week, whatever -- so that he has to be held to determine whether or not he doesn't have to be held pending a report date?

MR. FOSTER: You could hold that hearing. You wouldn't need to go through that procedure. And by hearing, it wouldn't even -- if everybody was agreeing to it, it wouldn't have to be a full detention hearing. It could be as simple as just telling Mr. Jamerson what was going on. There's no evidence that ever happened. More importantly, if it ever did happen, there's certainly no evidence that Ms. Jamerson, the custodian, knew about it.

THE COURT: When you say, let the defendant know what's going on, what more needs to be said other than, you will be allowed to self report, but you are being released under the terms -- under the same terms as your bond as executed by Judge Metcalf.

MR. FOSTER: Nothing more needs to be said. Two points to that though. In this case, the only evidence is that the condition of release after sentence was that he self surrender. There's no evidence of any additional conditions.

THE COURT: Wait a minute. But he was specifically told that he was being released under the same terms as he had been released before so why do you say that there's no additional

condition? All of those conditions -- he was informed that all of those conditions apply.

MR. FOSTER: Well, I wasn't there, but I haven't been provided any evidence that that's the case. So I can't concede that when I have not been provided any in discovery. Judge Metcalf wasn't provided any. There is an order in the file -- and I do have that -- which does say he has to self surrender and he's permitted to self surrender.

Possibly more importantly than that is the fact that there is zero evidence, because it didn't happen, that Ms. Jamerson, the alleged custodian, was told of this. One of the elements of a -- of contempt is a reasonably specific order.

Now, there can't -- an order that says if something else happens, then the order changes. I would argue as a matter of law, is not a reasonably specific order. Even if the Court finds it is a reasonably specific order, it would have to be an order that was communicated to her for her to be in contempt of it. It was communicated to her in November of 2023 that she had these responsibilities. On February 1st, 2023, she ceased to have those responsibilities unless other conditions happened.

There's no evidence that anybody ever informed her that she had any continued responsibility to do anything after February 1st. That's the motion to dismiss.

THE COURT: If you are correct -- I'm trying to figure out, what is the procedure that you think needed to have been

undertaken.

So, for instance, in order to have a separate 3143 proceeding at the conclusion of the revocation hearing that involves a custodian, you're saying that custodian would have to have been present, correct?

MR. FOSTER: Yes.

THE COURT: So that brings me right back -- because there's no obligation for the custodian to show up for the revocation hearing. Therefore, whenever I allow someone to self report, I would have to remand them to the custody of the Marshal to be detained until Judge Metcalf can have a hearing as to whether or not he's allowed to self report and then the custodian would have to come to that hearing.

So we'd have to go through all of those steps for, number one, remand to custody. Number two, setting the hearing. Number three, notifying the custodian. So that's what you say is required under the law?

MR. FOSTER: It's definitely not required.

THE COURT: Well, then how do you do it if -- I mean, if you're saying those are the steps that are missing.

MR. FOSTER: It is required for there to be a conviction of contempt of court for violating a particular order.

THE COURT: Well, but -- maybe I'm asking this question in a way that is too obtuse, but the thing is -- if I'm understanding your argument -- in order for a custodian to have the

responsibilities that I think everybody here thought a custodian had, I have to go through these steps of remand, Judge Metcalf setting a hearing, notice to that custodian, separate hearing where that custodian can get notice of, yes, you still have the same responsibilities as you did before.

All of those steps that we're going to have to go through on every one of these from now on for there to be any effective custodian pending report for service of the sentence.

What am I -- either you're arguing that or I'm missing something.

MR. FOSTER: I am arguing that. I don't think the solution has to be what your Honor says. I think one obvious solution is if somebody has no bond violations, just say they all still exist except there's no custodian. Another is to give advance notice that you're considering revoking and have the custodian come and tell you at the detention hearing that's going to happen at the sentencing hearing or at the plea -- I mean, it happens all the time in magistrate court when there's a delay between plea and sentencing.

There is not the -- the part of the difference here is because it was a supervised release violation, there is no delay. But that is what happens. If somebody is on release with a custodian and they're -- and they plead guilty before Judge Metcalf, there is another hearing, another detention hearing, where Judge Metcalf makes the same findings.

And if he makes the findings that the person can only be released if there's a custodian, then the person could not be released if that custodian is not there. It's not uncommon for that hearing to happen.

THE COURT: But for a revocation hearing, it is not uncommon for the custodian not to be here. So I would have to go through every one of those steps.

MR. FOSTER: Or -- well, only if this -- only if your Honor finds, as the sentencing judge -- which you will be, I think in every case, other than probably misdemeanor -- if you find that release without the condition of a custodian would -- would satisfy the conditions of 18, 3143, then the person goes home and can self surrender.

THE COURT: If that defendant had a custodian up to that point, I would find it very unusual that the Government would consent to self report without the continuation of that custodian. I cannot imagine the scenario in which that would occur.

MR. FOSTER: I can't either, but they could be and probably -- well, I don't know if they are. I don't want to get ahead of myself, but they very well may be required to -- to tell the defendant in advance that they were looking to revoke their release. And if they're looking to revoke their release, then the custodian may come. And if the custodian doesn't, then you're right, the procedure would be that you would say, sorry, I believe that the custodian is necessary to satisfy 18, 3143. There is no

custodian. If you want to file a motion later, you can. And, again, that is the procedure when everything is done by the magistrate.

THE COURT: It seems like for the efficiency of this Court, it would be a whole lot easier for me to just say, the defendant is remanded to custody pending a motion to be allowed to self report and just leave it at that. Entirely eliminate from that proceeding at all whether or not there's an option to self report. And then if the defendant wants to self report, that he can make his own motion.

MR. FOSTER: Well, maybe I'm incorrect in my assumption, but I've been involved in cases in the past where the person who doesn't have a custodian is allowed to self report.

Certainly there's no issue as to the defendant. Mr. Jamerson knew of his conditions. He was there. If your Honor did indeed say, you're under the same conditions, then that is -- I think that suffices as an order under 18, 3143. There's been no evidence. I mean, you were there and I wasn't. I'm not calling you a liar.

But there's no evidence in this proceeding that that was done. The evidence in this proceeding is just, I guess, as an operation of law, this -- this November 2023 order remains binding on her indefinitely.

In fact, as far as I know, I don't know that Mr. Jamerson has been sentenced on his supervised release -- well, he's

definitely not in the Bureau of Prisons so he hasn't reported for service of that sentence yet. If he were -- I mean, by that logic, if he were to escape from jail, it's her responsibility to call someone. And that can't be the case.

THE COURT: Well, he's been indicted again, correct?

MR. FOSTER: Right. But if he is still -- well, the Court likely revoked his release when he was arrested, which would, I hope, end this November 2023 order. But according to the argument and the logic presented today, the order just goes on forever, despite the fact that the statute it was issued under, pursuant to its authority, very specifically says it's release pending trial.

THE COURT: Well, other than that issue, do you have anything that you want to argue?

MR. FOSTER: Yes. Hopefully I'll do it briefly, but I have several.

An element -- I touched on this in the earlier discussion. An element of the crime of which she is being tried for is a reasonably specific order. If the Court holds, as it seems like you're leaning to, that this order is -- says that if someone is convicted, the -- it is the requirement of the custodian to know that and to find it out and to find out what her future responsibilities are, then that is not a reasonably specific order. An order which says these are the conditions that you -- this is what you're required to do. And if X happens in the future, the conditions may change a little bit and it's your responsibility to

find out what those responsibilities are, how you can do them.

You apparently have no option to refuse them at that point because if -- I don't know if the order just goes on in effect, the person who's -- who's subject to obligation under the order would have no idea that they were subject to additional obligations or fewer obligations or different obligations.

That -- if that is what this order does, which is that it just automatically kind of transforms whenever somebody wants to transform it, that is not a reasonably specific order, which is the very first element of a contempt charge. If you get past that, finally, the element of willfulness.

Now, I understand that Ms. Jamerson's education level and her particular mental frailties are not in evidence, but what is in evidence is both the statement of Steven Jamerson about those very things. I believe he used the word countrified and I believe he did use the word uneducated.

Certainly in her interview with the officers, you see an enormous amount of confusion to the point that both Officer Adams and the Marshal, whose name I forget -- and I apologize for that -- but both of them were getting extremely, extremely frustrated by the fact that she was unable to communicate with them.

That is not an act. I know Ms. Jamerson. I know Mr. Gast believes it's an act. That is not an act. Steven Jamerson said it wasn't an act. I think you saw it on the recording.

To prove beyond a reasonable doubt frankly that Ms.

Jamerson ever had any idea what her obligations were under the November 2023 order, I think is a stretch.

But as to the specific obligations --

THE COURT: Well, let me stop you there. So are you suggesting that at a detention hearing where there is a proposed custodian, which is a very common situation, that Judge Metcalf needs to examine the proposed custodian to the degree of having a clear idea of the education, the ability to comprehend of that particular custodian regarding the responsibilities that are being placed on that person?

MR. FOSTER: Well, he does if that person is later going to be found to be willful for violating it. Well, he doesn't have to. He can make a person who doesn't exist a custodian if he wants to. I don't know why he would ever do that, but the -- yeah, we're not talking about what he can do to release somebody. We're talking about whether somebody can be convicted of a crime for willful behavior.

THE COURT: You're trying to separate two things that can't be separated. Because a custodian is no custodian at all and has no responsibility at all if there are no consequences for a failure to discharge that responsibility. So you're saying that a custodian can be appointed and doesn't have any understanding of those responsibilities and there's no proceeding to really determine whether or not the custodian understands those responsibilities and, therefore, there is the equivalent of no custodian at all except on

paper.

MR. FOSTER: Judge Metcalf does routinely hold those interrogations when he appoints a custodian. I've been there.

THE COURT: Then how did he fail so badly in this case?

MR. FOSTER: I wouldn't call it a failure on his part. I would not call somebody else's grace and mercy a failure ever. But did he correctly identify that Ms. Jamerson was wrong when she said, I understand what I'm doing and I understand what the consequences are? I think it was a mistake, yeah, but --

THE COURT: But is that all that is done in the circumstances of a detention hearing of asking the proposed custodian, do you understand what your responsibilities are? Do you understand what you're being required to do and that's it? That's all that's done?

MR. FOSTER: Generally when I've been involved in them, Judge Metcalf has specifically talked to the proposed custodian before doing it. So what is required in terms of appointing a custodian is less important at this point than what was done.

Judge Metcalf did talk to her and made the -- made the -- came to the conclusion that she could understand what it is that she was supposed to do.

THE COURT: Well, if that is -- assuming that was done, that a determination was made by the Magistrate Judge that she understood what she was doing, how is that not the law of the case? In other words, that that was a final determination that was made as

to her ability to discharge the responsibilities and, therefore, coming back now and saying, well, maybe that wasn't the case, is something that's already been determined by the Court.

MR. FOSTER: Because she's charged with a crime and the Government has to prove beyond a reasonable doubt that the conduct was willful. That -- I guess I don't really get the question because we're not talking about whether -- I don't think whether Judge Metcalf made the right decision is relevant at all at this proceeding. I think he -- but he did make -- he -- you're right, he made the decision that he thought -- based on a short conversation with her -- that she understood.

By the way, perhaps I got ahead of myself because it also doesn't matter whether she really understood -- how much she understood of what she was supposed to do is. What does matter is whether there was a specific violation of this order and whether it was willful.

THE COURT: Well, it does matter because what you are calling into question is, in more than one respect, the very ordinary practice of this Court, including the magistrate's court.

And it sounds to me like you're saying with regard to detention hearings and also with regard to revocation hearings in some instances, that we need to substantially retool the way we do things. If we need to do that, we certainly can. I don't know that that will be particularly popular, but I'm not here to be popular. We can retool that.

I can talk to Judge Metcalf and he can make those detention hearings with regard to appointing of custodians much more -- I don't want to say have teeth to them, but have a greater degree of specificity in the findings at that time, which I think will result in far fewer defendants being released on bond with a custodian.

And then we can do the same thing with regard to allowing defendants to self report. To go through that additional hearing, whether it's here or whether it is in front of Judge Metcalf. We can do that.

I'm just surprised that over my last 17 plus years here, nobody has ever suggested that we're doing it wrong.

MR. FOSTER: I'm not suggesting that you're doing it -- I don't think this situation is going to repeat very often.

THE COURT: But we can make sure that it never repeats again.

MR. FOSTER: How often -- I mean, I don't know. I don't mean to interrogate the Court, but how often has a person who had a custodian -- how often -- I've never heard of a custodian being charged with contempt in this district or any other one.

THE COURT: Well, the ones I remember -- and Mr. Gast may remember this better -- have tended to be indicted rather than being brought on a contempt hearing.

MR. FOSTER: Right. And certainly if the person was indicted, they're entitled to put up -- we're not putting up the

defense -- I'm not saying that -- but they're entitled to put up a defense of a mental def -- incapacity defense. I mean, that's -- they would be allowed to and I don't -- I suspect they never did because it's just not a situation that's going to repeat itself very often if ever.

I think -- and you saw a little bit about this on the video. I'm a little surprised by your Honor's questions but, I mean, to Mr. Gast and Mr. Adams, the result of what has happened on Ms. Jamerson is amusing. I mean, she is -- she's poor, she's not educated, she's -- again, she's -- she's on -- she's got full disability. She's exactly the type of person that making -- as your Honor said -- well, your Honor said it as to defendants -- but making them suffer is part of their job, part of what they do for a living, part of what they like to do.

MR. GAST: Mr. Foster, don't speak for me, please.

MR. FOSTER: All right. But when your Honor says that there's going to be more suffering on defendants if you require that -- the magistrate to make a determination that a custodian is capable of understanding that --

THE COURT: I'm not talking about more suffering on defendants. I'm just saying that by going -- holding things to -- holding the proceedings to require that much more, that much higher of a standard for the appointment of a custodian is going to, just as a matter of logic, will result in there being fewer custodians appointed and, therefore, fewer defendants released on bond. It is

a product of what you are advocating. It's not any effort on anybody's part, whether the Government or the Court, to make anybody suffer. It's if you heighten the standard, there is a consequence of heightening the standard. That's just logic.

MR. FOSTER: Right. And you're certainly not going to have more people released on bond. My point is I don't think it'll be all that -- most people that are released on bond don't have custodians. Those that do have custodians, the vast majority of custodians are not in the situation that Ms. Jamerson is in.

That said, we're not at a detention hearing here. We are at a criminal trial and to prove beyond a reasonable doubt that Ms. Jamerson's conduct -- or to find beyond a reasonable doubt that Ms. Jamerson's conduct was willful based on some unknown possibility of how many people are going to be released on bond in the future is desperately unfair to Ms. Jamerson.

She is -- she is charged with a crime and if your Honor finds beyond a reasonable doubt that her behavior was willful, she's going to be punished for a crime. So if she wasn't willful or if there is not evidence beyond a reasonable doubt that her conduct was willful, the Court has to acquit her, whatever the consequences might be.

Now, I don't believe that -- I don't believe that it will change the policy all that much at all just because I don't think -- as I said, most people who are released are released without custodians and most people who are released with custodians, this is

not going to repeat. But if they do intend -- if the Court does intend to charge the custodian with contempt every time a released defendant violates a condition of release, then that is true. There is a chance of this repeating.

That's another thing. I don't think that most people -- I mean, I've represented a lot of people who have violated conditions of release who had a custodian where those conditions were revoked and I don't recall the custodian ever being charged with contempt.

So I just -- I don't see this as being a situation that's going to repeat very -- very often anyway. But even if it is, it can't be a consideration in the determination of whether there's proof beyond a reasonable doubt that what Ms. Jamerson did in this case was willful.

What Mr. Gast talked about in terms of what her obligations were, were far broader than what is in this order. I -- you know, I don't see anything in this order that prevented Steven Jamerson from leaving the house, whether Ms. Jamerson knew about it or not. I don't see anything in this order that prevented Mr. Jamerson from sleeping in the shed, which the Government concedes there's nothing in here about that. There is something in here about him not using drugs, although I don't think there's any evidence that she knew of that until long after the fact of them telling her basically.

So I just think it fails on the first element -- the

Government's proof fails on the first element. It fails on the third element. And, as I said, I don't think you get to the elements because I think that the order itself is -- and, again, what the Court's procedure has to be cannot be a consideration in whether the case should be dismissed on a Rule 12 basis. In other words, no reasonable --

THE COURT: I want to go back to what you were arguing a moment ago about there's nothing in the order that says that Mr. Jamerson has to live at the residence with Mrs. Jamerson. Because the bond order, the conditions of release specifically say the defendant is placed in the custody of Connie Jamerson and it gives a particular address.

MR. FOSTER: Well, that --

THE COURT: I mean, how can a custodian exercise custody over a defendant if that defendant lives somewhere totally different?

MR. FOSTER: Well, that brings up another interesting question about -- I mean, I understand why -- your interpretation of the language. I would interpret it differently. That said, it is regularly done in magistrate's court, that somebody has a custodian that they don't live with.

THE COURT: But that is something that is expressed in the conditions?

MR. FOSTER: They just use this form the same way. It says the custodian is this person at this address. It's

oftentimes -- sometimes it's a girlfriend, sometimes it's an aunt. Sometimes it's just somebody responsible to tell the Court if the person is not complying with their conditions of release.

And under your Honor's interpretation of this order, that's not even legal because if -- if the form order requires that the custodian -- that the person is in the physical custody of the custodian, then those orders violate it.

Again, I don't like arguing about other cases and the results because what -- what this proceeding is about is whether they can prove beyond a reasonable doubt --

THE COURT:  Well, again, other cases has to do with the law as it is applied because the law needs to be applied uniformly. And if I'm going to apply it uniformly, I can't have one set of standards for Ms. Jamerson and then a different set of standards for all those other cases.  I have to -- I have to apply the law as I understand it exists and has been applied by this Court, including magistrate's court, and apply it to this case just like I would any other case.

MR. FOSTER:  Right.  I'm not asking otherwise --

THE COURT:  But it sounds like you are.

MR. FOSTER:  -- but your Honor said --

THE COURT:  It sounds like that's exactly what you're doing.  You keep coming back to, well, this is a totally different situation.  Anything that would be done in other cases, that's irrelevant.  We need to look only at this case.

And, you know, I understand that, that this case is unique. But it is unique in that the same broad law, as it is applied in this Court, needs to be applied uniformly in this case.

MR. FOSTER: I don't think I'm -- I don't disagree with that and I don't think the argument that I've made counters that. The argument I've made is that this person did not willfully violate the court order because the court order -- she's not capable of it and most custodians will be capable of it. Some, I guess, will not. I would think in most cases when it would be as -- well, again, we don't want to talk about most cases so...

THE COURT: Do you want to argue at all with regard to the particular violations that were articulated by Mr. Gast or are you conceding that as to those elements, they have been proven beyond a reasonable doubt and you are relying only on the willfulness element and then this argument regarding 3143?

MR. FOSTER: No. I don't need to make any additional argument on that except that we do -- they have proved beyond a reasonable doubt that Mr. Jamerson did not surrender and they have -- and that it is a -- it was a violation of his order. They have proved beyond a reasonable doubt that Ms. Jamerson did not call them and tell them.

Again, as to the willfulness argument, there's also the question of whether she had a phone or a car. Your Honor has heard a fair bit of evidence that she didn't. So what she was supposed to do to comply with her obligations under this order I think is still

a very large question, whether they've proved that to be willful beyond a reasonable doubt. But certainly they have proved that Mr. Jamerson did not self surrender, that Ms. Jamerson did not call and that the order did require Mr. Jamerson to self surrender.

THE COURT: Okay. Anything else?

MR. FOSTER: No, sir.

THE COURT: Well, Mr. Gast, let me hear back from you on this whole issue of how the extension of the responsibilities of a custodian should have been handled with regard to Ms. Jamerson after the defendant here, Mr. Jamerson, had been found responsible for the supervised release violation and sentenced.

MR. GAST: Yes, your Honor.

With respect to that argument, your Honor, the argument relies entirely on a false premise, which is that there is an obvious end date of the order that's at issue of February 1st and that's just not the case and that's wrong. There's nothing in the order that says that and there would be no way for either Mr. Jamerson or the custodian, Ms. Jamerson, to have that understanding.

So in answer to the question the Court just posed, what did we do wrong, the answer is nothing. The Court did exactly what it should have done in this circumstance.

At the conclusion -- on February 1st at the conclusion of the hearing, the defendant, Mr. Jamerson, requested to remain on bond. This Court adopted -- essentially adopted the findings of the Magistrate Court saying that the Court already previously found the

requirements necessary using 3142, that would be applied in 3143, and then ordered that that order -- that he be -- continue to be released on the same conditions of bond.

The faulty premise is that it would be obvious to the custodian that as soon as that hearing was over, that her obligations ended and that's just not the case.

I'd point to a couple of things. One is he's resting this argument entirely on, as I understand it -- and, again, this argument was raised for the first time last week and so I'm basing it entirely on that filing in the motion to dismiss.

But as I understand the argument, it's entirely based on this reference on page 2 of the order that's under additional conditions of release. It says, pursuant to 18 U.S.C. 3142(c)(1)(B), and then he looks at basically the title of the section of 3142, which is -- which says, release or detention of a defendant pending trial. And then, therefore, he draws the conclusion that because that citation is in there, then obviously the -- the -- the order just simply expires at trial and that's a faulty -- that's faulty logic and a faulty assumption for a couple of reasons.

One is, as I discussed in the Government's response and as the Court has already indicated is aware, in 3143, which is entitled, release or detention of a defendant pending sentence or appeal, under (a) subsection, the last sentence says, if the judicial officer makes such a finding -- that is, that it's okay for

him to be released -- such judicial officer shall order the release of the person in accordance with Section 3142 (b) or (c).

So when this Court, at the conclusion of that hearing on February 1st said, okay, you've requested to continue to be released, I will do that except I will only do that upon the previous order, the Court was following 3143, in referencing back to 3142, which is what the release order does.

So that -- there's nothing in this -- there's really nothing in the order that gives a terminus other than when he's no longer under conditions of release.

My second point about that is there's a -- there's contents of this order that are contrary with the defendant's position, which is item number 4 on page 1 of that order says that the defendant -- one of the conditions of release is the defendant promises to appear in court as required and, if convicted, surrender to serve any sentence imposed.

And so that clearly indicates that this order will continue to live, at least until the defendant is no longer under conditions of release. And in this instance, to surrender for sentence. So there's nothing in the order that would give anyone the mistake that it ended on February 1st.

And I -- I share the Court's concerns that if we were to interpret it that way, that we would have to have custodians present at every sentence -- sentencing because there would be a possibility of them given the report date and we would have to ensure that every

time -- or we'd have to remand to the magistrate court for further findings. And just none of that is necessary under this order.

So there is no source of confusion. The only source of confusion is confusion the defense counsel is trying to generate by making this false comparison between 3142 and 3143.

So the Court did exactly what it always does. The Court did it entirely correctly and so the defendant continued to be in the -- on or -- conditions of release.

Now, had the Court revoked that -- ordered him to surrender to the Marshals, the custody of the Marshals, that would revoke the order and then it's revoked and it would be clear to everybody. Or if he was acquited, he would be no longer under conditions of release and so that would be obvious to everybody.

But there's nothing in this order that should have confused Connie Jamerson or anyone else that he was still under -- that he was still obligated under this order and, therefore, that Connie Jamerson was still obligated under this order.

I wasn't at the hearing. I don't know if Connie Jamerson was at his hearing on February 1st or not. Let's assume for the sake of discussion she was not. But certainly when Connie -- when Steven Jamerson showed back up at her house, she knew that he was continued -- he was -- continued to be under release.

Mr. Foster also said that there is no evidence that she knew that she was under the -- those obligations. And I've played about an hour and a half of evidence that she knew every one of

those obligations. She went through all those things with her and at no time during this interview did she say, wait a minute, I thought I was done with that as of February 1st because he's already had his hearing.

She talked about how she knew that she had to tell him did -- and did, in fact, tell him to surrender to BOP. She complained about how he was always, you know, doing his own thing and she didn't have any control over him, et cetera, et cetera. She indicated that she knew that he was using drugs and, boy, she really hoped he'd get some treatment and things like that.

So, you know, this notion that there's no evidence that she knew or understood that she continued to be the custodian is clearly false. And certainly that's something that she could have asserted if she actually believed that.

So, you know, then he -- Mr. Foster sort of adopts this false -- the strawman argument to find otherwise means the order goes on forever. No, the order doesn't go on forever. It goes on until he's no longer under conditions of release. He's removed from conditions of release if he's acquitted.

And the Court has seen this. Sometimes if a defendant is in custody and they're acquited, they're still remanded to the Marshals briefly for out processing and they're inform -- the Court routinely informs them of that.

But -- or when he's taken into custody. Then obviously if he's taken into custody and he's in -- at the Bureau of Prisons

or in the local jail, obviously she would not have any conditions.

So this argument that he made of, well, what if he escaped, then she would still be under conditions. No, of course not. Because if he was taken into custody, he would not be released. That would be the terminus of the order and she would not be obligated under that. So that was meritless argument.

His next argument kind of conjoins with the first, which is that we failed to meet the obligation that this was a sufficiently specific order and then he basically tied in that original argument. So, again, I would argue that the order is very specific and readily apparent.

And furthermore, that the defendant -- that the custodian, rather, readily understood that she was still obligated by its terms and never -- and given an hour and a half of interview, never renounced its terms or said, I'm not obligated under it anymore.

That brings me to the willfulness argument, but I don't want to leave that unless the Court -- if the Court has questions for me, this would be a good time for that.

THE COURT: Go ahead.

MR. GAST: Okay. Lastly, this willfulness argument. You know, Mr. Foster's interpretation of that interview and mine are quite different. I think my impression and what I would suggest to the Court is that she was not confused, she was not stupid, she was not unable to understand what was going on. She was being very

cagey and she was trying her best not to get herself in prison for harboring while at the same time not helping the Marshals find her son.

I think that's the impression that her interview conveyed. She -- it was clear she was trying to -- not that she didn't understand the questions, she was trying to dodge every question. So was the Marshal frustrated and was the probation officer frustrated with her because she was being cagey and dodging the questions? Absolutely they were.

I applaud them both for their professionalism and their patience in the face of her obvious contempt of the order and her caginess in trying not to comply. But there's no evidence that she did not understand what she had to do. In fact, quite the opposite. When you look at all the things she said, she said that -- it was clear she knew her obligations and at least tried to complete one, which is she did tell the defendant of his report date.

And then claims at least that on the date he was supposed to report to BOP, went to him and complained to him that he was not complying and encouraged him to, you know, turn himself in or call somebody. So she understood the obligation. She just then didn't do what she had to do to go further than that.

You know, certainly there would be circumstances where someone would not be willful in, you know -- for example, had Steven Jamerson taken the keys to the car and then tied up his mother and locked her in a closet, her failure to notify someone would not be

willful. But it is clear that she made zero efforts to notify the probation officer of any of the transgressions.

And even if we were to consider her limited access to a phone, some of these violation, there was ample opportunity -- I mean, again, Steven Jamerson said he was gone as of at least as early as March the 18th. So that's a month where she could have sent an email, written a letter, borrowed someone else's phone.

She talked about her son, Cody, who also was supervised under state probation at that home having a phone --

THE DEFENDANT: Can I say something?

MR. GAST: -- so she could have borrowed that phone. So it's clear she understood, she just didn't want to do it. And it's clear from her statements that she didn't want to do it.

There was repeated instances of statements throughout the interview of her saying things like, he's a grown man. I want him to do the right thing but what am I supposed to do? He can be responsible for himself. That wasn't her job though. Her job was to be the custodian and she simply failed to do that.

That's all I have unless the Court has questions.

THE COURT: Okay. Thank you.

MR. GAST: Thank you.

THE COURT: Mr. Foster, did you have some additional thing that you were wanting to say?

MR. FOSTER: No, sir.

THE COURT: Okay. Well, to go through the particular

elements, the Government asserts that several things have been proved beyond a reasonable doubt and that I would find that the -- there were multiple violations of the conditions of release by Mr. Jamerson, which Ms. Jamerson expressed on the videos that she was aware of, including Mr. Jamerson's use of drugs, his having absconded from her custody such that she was unaware of his whereabouts. His having failed to report for the service of his sentence and his having an encounter with state law enforcement during which Mr. Jamerson, again, ran from law enforcement and eluded law enforcement. And that Ms. Jamerson has admitted being aware of each one of those.

And in addition, that as to none of those instances did Ms. Jamerson undertake any effort to communicate in any way with the court and particularly with the probation officer.

There's been substantial evidence also that Ms. Jamerson at no time had a telephone, even though I do find that where she was appointed as custodian, she signed off particularly identifying a phone number as being her phone number. Thus, representing to the Court that she did, in fact, have a telephone at that time. What may have happened to that telephone thereafter is not before the Court.

But the gist of the defense that is being presented here is with regard to elements other than the actual activities of Mr. Jamerson and the activities or failure to act on the part of Ms. Jamerson based on the knowledge that she had.

First of all, regarding the element of the specificity of the notice and particularly the notice of whether or not the responsibilities of the custodian extended beyond the February 1st, 2024, revocation hearing. I believe the terms of the document itself are clear that the conditions of release extend all the way up until the beginning of the service of a sentence in the event that a sentence is, in fact, imposed.

So the document which is in evidence which is undisputed, namely the November '23 order, clearly extended and the responsibilities of Ms. Jamerson clearly extended beyond February 1st, 2024.

With regard to the issue of willfulness, I rely entirely on the video wherein Ms. Jamerson, at various points, acknowledges, I believe each of these points. She knew what her obligations were and yet notwithstanding that knowledge, did not fulfill those obligations.

And I think willfulness is most clearly shown by the statement that she made, I believe more than once -- I think it was actually stated twice on the videos -- of Mr. Jamerson is an adult. He should be responsibile for himself. Essentially expressing her abdication of any responsibility for his meeting the conditions of release.

Therefore, having found beyond a reasonable doubt each of the elements regarding indirect criminal contempt in this matter, I find that Ms. Jamerson is, in fact, guilty of such contempt.

That brings us to the question of what is the appropriate sentence to impose.

Mr. Gast, I'll start with you.

MR. GAST: Thank you, your Honor.

As I said earlier, you know, contempt hearings are unusual so it's not that there's a well-worn path to the bench on these kind of things where we can look to other cases and say, we've done this a lot.

In the few instances I've been involved in contempt hearings, it's generally been my practice not to recommend a particular sentence and the reason I don't is because I think contempt is -- I mean, of course, all things -- all sentences flow through the Court so I don't mean to imply that in other courts -- in other circumstances it's not the Court's role. But contempt hearings in particular, this is a uniquely -- a unique situation where the -- it is this custodian's contempt of this Court's order. And really, I think this Court is in the best position to assess how it sits with the Court and what the Court thinks it needs to do about that.

So rather than give a specific date, I want to talk about a couple things generally and then perhaps provide the Court with some helpful markers.

First, with respect to -- I want to return -- I said I would return to this at sentencing, but I want to return to the topic about the investigation of the custodian as to whether she

should be charged with harboring.  And, you know, at the time of the offense, we knew that -- or at the time of the interview really, we knew that Mr. Jamerson, the defendant, was -- had absconded, had run from officers, had not turned himself in a week or so prior.

His car -- well, actually -- I'm sorry, the custodian's car had been picked up on license plate cameras and on surveillance at Hillcrest at times.  They knew he was out and about.

And also, by the way, they found -- and the Court actually saw that in the video -- that the Marshal had a picture on his phone at one point of the black Kia that was on the pictures from Hillcrest that came up on Officer Adams' recording.

But really, what saved her from being charged with harboring is we really just couldn't prove that she provided him the keys after he fled.  And had she -- had we had evidence that he came to the house and collected the keys from her after taking flight from the Marshals, I probably would have indicted her for harboring.

So I'm certainly conceding we can't do that, and I'm not trying to encourage the Court to find her half guilty of that, that's not my meaning.  I simply mean that this is very serious and she came very close.

And, additionally, when the Marshal and the probation officer showed up at her house to look for him and also to ask her these questions, what they were met with were caginess, obfuscation, deflection, anything but cooperation.

But not only that, with respect to that car -- and,

again, had the keys transferred from her hand to his, we would have charged her with harboring. Or had we had proof that she had given him money, we would have charged her with harboring.

Now, she indirectly apparently gave him some money, but that was really more of Steven Jamerson taking it from her via the PayPal card probably without her notice -- or without her knowledge.

But what she did also do at the scene was -- and I can give the Court time indexes if the Court wants to see it again -- she initially told them that car was white and then later on said the car was black. The car was black. We saw the picture of that on the Marshal's phone.

But, you know, at the beginning it was -- she made a choice to miss-describe the car, I can only conclude that -- so that it would help the Marshal -- make it that much more difficult for the Marshals to find him.

So, you know, because she had owned that car for years. She talked about how it was her husband's before he passed. That she continued to pay the insurance, continued to pay the tag. She was very inconsistent about when and under what conditions she gave the vehicle to the defendant. And I would submit that caginess is because she probably knew that it was bad for her to admit that she gave him the keys to the car after his failure to report or after his flight from the officers. So this is very serious.

We also know from Steven Jamerson, in terms of the absconding element, that he'd been gone for quite a while.

According to him, he believed he was long gone -- I think is what -- the words he used by -- before March the 18th.

So this wasn't just a little bit of contempt or a technical amount of contempt or, you know, a failure in one regard. It was clear from all the evidence that her contempt of the order was virtually complete and utter. That there was not a single thing that she intended to do to help the Court monitor his -- her son's release.

So that brings me to a deterrence. You know, of course, sentencing, the Court needs to consider deterrence. In terms of specific deterrence, I don't think she's going to be before this court again as a custodian because I don't think anyone would ever be stupid enough to make her a custodian again. In fact, I don't think anyone is going to be stupid enough to give Steven Jamerson a bond ever again if he's ever before the Court again. We certainly hope that he's not and we certainly hope that Connie Jamerson is not before the Court ever again.

So I don't -- I certainly don't make the claim that specific deterrence is necessary here, but general deterrence is very necessary.

The custodian practice exists for a reason. It exists so that we can release people rather than detain them and mitigate the risk they're going to flee or do harm to society. And our courts operate on that trust. And as the Court alluded to in its questions earlier, if we back away from that or if we fear the efficacy of

that trust, then we're going to release fewer people.

And, you know, Mr. Foster was concerned about the suffering of people. That's going to cause more suffering by keeping more people held in custody that could be released if they're -- to custodians if we would trust that. And the only way we can trust that is to have general deterrence. There has to be a consequence for not doing it.

And it was clear in Ms. Jamerson's case that this was not just one element of the bond, but it was pretty much the entire bond order. She had no intention of adhering to any of it. And there has to be a consequence.

I do recall another occasion of someone being held in contempt in magistrate court and -- and Judge Howell was the magistrate at the time. And I don't remember the defendant's name, I don't remember the circumstances. But what I do remember is that he held someone in contempt and it was the mother of a defendant and he ended up giving her -- he didn't follow the same procedure as we did here of just making a reference by 636 to this Court, he handled the contempt there. And he gave her -- I don't remember if it was a week or two weeks in custody.

Almost every detention hearing that I attended after that where there was a mother or a close family relative that was going to be a custodian, Judge Howell told that story. He told that custodian, now, let me tell you, I've had occasion where the custodian didn't listen to me and didn't follow through this and I

had to put her in jail.  And I didn't want to do it, but I did.  And I'll do that to you and so -- but he's say, I don't want to do that to you, but you have to understand how serious this is.

Judge Howell did a very good job, therefore, of making active use of general deterrence.  And, you know, statistically, whether that would have -- whether that stopped people, I don't know but -- it's hard to know -- but that general deterrence matters.

And certainly, you know, if this Court -- I would submit if this Court does nothing to Ms. Jamerson in terms of punishment, then I think, you know, perhaps this attorney or perhaps others might advise custodians in the future, you know, well, this is asking you to do that, but they're not going to do anything to you if you don't do it.  So don't worry about it.  This isn't that important.  We certainly can't have that result.

The other thing I would say is, you know -- you know, Mr. Foster in filings and orally today ascribed a lot of malice to me and I -- and I -- I'm offended by that, but also I certainly agree -- and I think there's a lot of sympathy here because the custodian is his mother.  And I think everybody deserves to have a mother that is going to watch out for them in thick and thin and, you know -- and so there's -- that is certainly a mitigating factor that the Court should consider.

However, almost all the custodians that the magistrate court considers are some sort of close relative.  There are -- you know, Mr. Foster mentioned girlfriends occasionally of being

custodians. That does occasionally happen, but it's almost always a brother, a mother, a father, someone close like that.

And by the way, it has not been my experience that the custodian lives in a different place than what's on the order and lives in a different place than the person supervised. That's not been my experience but --

THE COURT: Of course, a lot of times the custodian is for the purposes of transportation as opposed to --

MR. GAST: Yes.

THE COURT: -- a circumstance such as what we have here. And, of course, there, there isn't a requirement that the custodian have custody for the living arrangements, it is custody for the purpose of putting the person in the custodian's vehicle to take the defendant somewhere.

MR. GAST: Yeah. Usually to drug treatment. That's right. And there's a check box that differentiates that in the order. And in this case, there was -- the other box which is for all purposes.

So while I -- while I acknowledge that there is some sympathy because the mother is -- the custodian is the defendant's mother -- and we recognize that that bond is close and we recognize that mothers often, you know, over love their children and do things that, you know, we may not like because they're trying to look out for their children or, you know, trying to say the car was white when it was really black to keep the cops from finding their son.

These things are understandable. So I'm certainly not failing to recognize how understandable it is.

But the problem with that argument, though, is that we rely on close familial custodians and we just can't say, awe, shucks, it's your mom. I get it. We're not going to do anything.

The other thing I will say, though, is in addition to the damage that is done to our court system and our system of release, this was not good for Mr. Jamerson either. This enabling him by letting him do whatever he wants did him a disservice.

He got back on drugs. He was -- according to his interview -- trading sexual favors in order to get drugs. He was, you know, out and about fleeing from officers. He got convicted of new crimes. He broke into someone's house. He resisted officers, gave fake names.

He's been charged with a new offense for failing to report and the Court will consider his punishment at that time where presume -- I presume the Court will -- we will certainly ask the Court to give him some additional time consecutive to that.

This enabling did him no benefit. And so while I am sympathetic to her motives and to her feelings of affection that she has for her son that caused her to make bad decisions, it wasn't good for him and it wasn't good for us, for the courts either.

I'm not going to suggest a particular term of imprisonment or other sanctions because I think that's uniquely the Court's role to look at here, but I do want to point to some

hallmarks that might be useful.

It was approximately two weeks between the BOP report date and the interview that we saw on April the 11th. It was approximately three weeks from the Bureau of Prisons report date to the defendant's arrest, during which he committed other crimes -- sounds like many other crimes -- because there were drug crimes that, of course, never resulted in charges. And it was approximately a month from when the defendant, Steven Jamerson, left her supervision for good and his arrest.

I think those might be useful hallmarks for the Court to consider that amount of time and also the amount of resources that went into re-apprehending the defendant. There was -- in addition to the probation officers' time and all of our time, there was all those Marshals there. You could see not just the one, but there were a bunch of them there looking for him. And the cost to society as Steven Jamerson was committing new offenses, getting arrested on other things.

So that's my argument to the Court, unless the Court has any questions for me.

THE COURT: All right. Thank you.

MR. GAST: Thank you.

THE COURT: Mr. Foster.

MR. FOSTER: Your Honor, Ms. Jamerson is nearly 60 years old. She has no criminal record. She finished either the fifth or the sixth grade in school. She lives on $1,200 a month disability

payments. That disability is for a significant mental incapacity.

You got a look on the video as to the circumstances of the way she lives. These are -- the very idea of jailing this woman for the reasons that Mr. Gast gives, to supposedly deter other people from creating situations which are inefficient for the courts is, I think, grotesque.

I hope the Court -- and, frankly, I believe the Court does not see the torment and the suffering -- there's that word again -- the torment of Ms. Jamerson that was evident on the video in the same way -- I hope the Court doesn't see it in the same way that Mr. Gast sees it and, indeed, sees it a little closer to the way I see it.

And I will tell the Court the way I see it is also informed by the fact that I know or I've gotten to know Ms. Jamerson and her son, Cody, a little bit. Not friends, just a business relationship. But I did something in this case that I'm almost positive I have never done before in 30 years. I contacted Mr. Adams and I told him what this case -- what this prosecution was taking out of Ms. Jamerson.

She's been distraught for the two months or whatever it is I've known her. Didn't help that there was a giant storm -- more than two months. Didn't help there was a giant storm in there. I actually wrote a lengthy email to Mr. Gast, which, again, I have certainly never written a prosecutor to tell them -- ask for humanity, but I said I just didn't know what was going to happen to

this woman. And the very idea that she should endure more so that future court hearings can go more efficiently is, as I said, grotesque.

Whatever the Court has to do, I hope it's in the -- something like a fine. As I said, she lives on $1,200 a month. I don't know what she's able to pay. Her son himself, who is in court today, is also disabled. He can get around himself, but you might have seen he walks with a cane. He's -- the two of them are all each other has -- have. Steven is in prison and is going to be there for a while. She lost her late husband who had been in nursing home. I believe he passed away like a month before she took the stand and told Judge Metcalf that she could do this.

And while she wasn't in great shape, between the passing of her late husband and the events of this case, I can tell the Court that for the last number of months, she's been just very distraught. At wits end. She's confused anyway and I think the last few months have heightened that confusion. So I hope the Court takes all that into account in doing what the Court has to do.

I did not know that story about Judge Howell. I'm a little surprised to have heard it, disheartened in a way, but to treat people in that situation that way as a booster of efficiency makes no sense to me.

And when I say efficiency being all, that really is in this case. I don't doubt that it took the Marshals some time -- a few weeks to find him. There was no great conflict in finding him.

When they found him, they put him in jail where he has remained since. And really nothing happened other than what Mr. Gast pointed out, which is that Mr. Jamerson made his own sentence worse and ended up putting his own mother in jeopardy.

But in terms of difficulty for the Court, all that happened in this Court was they paid some Marshals some overtime. And the suggestion that somebody who has never been to jail should go there because she cost the Court some money is just difficult for me to swallow.

That's all I have. I don't know if Ms. Jamerson wants to speak. Well, I'll let the Court address her.

THE COURT: Well, Ms. Jamerson, you have that opportunity now to address the Court and to tell me anything that you feel I should know before I make my decision regarding your sentence.

THE DEFENDANT: Well, I love both of my sons very much -- I love both of them youngins and I've tried to help them get through this stuff. And I can say one thing, I got one off probation finally. It took seven years, but my oldest -- praise God -- is off probation.

And I've tried to get my younger one to do what he's supposed to do the best that I can. And it's been really, really hard and even harder this time is dad's not there and it was just -- he was so distant.

It was like -- I just -- I don't know what to do with him. And it was, like, you know what you're supposed to do and he's

getting -- and it's like -- I couldn't cry, I couldn't get mad at him when he just started doing the same thing again.  It was just unreal.  I was trying to deal with an unreal situation about his daddy's passing in the nursing home, I was dealing with them, too, over it.  And then he start back doing the same thing he was doing and I was, like, he wasn't -- it was just all unreal.

It took me 'til just a week or two ago to actually talk to him like I did before.  Because it was, like, it just hurt so bad, I couldn't -- I didn't even want to deal with it.  But I do love 'em and I try to do what I can for 'em.

THE COURT:  Anything else?

THE DEFENDANT:  And the car that he took off in, they had just signed that over to me -- me and my husband -- we had problems about that car all the time before.

And then they gave me a paper from the court because I had to go get a tag.  The tag had been tore off the back end from someplace my son took it so I had to go buy a tag twice.  The second time I went to get the tag and they wouldn't let me have it -- that's after he had passed away -- so I go down there and they gave me a paper and signed the car over to me.  The first time my name has been on anything except for my shed that my son lives in, which is a very good shed.  And it's a house.

I mean, he moved out first and then he came back.  So I only had two bedrooms, one on each end, and both of my kids there when they were younger -- okay, he moved out first and then he moved

back and then he stayed, like, in the living room. That just -- that wasn't working, you know. So anyway, I bought the shed and that's what he lived in. So he has a bed in there, he has dressers in there. He has stuff in there, he can take food and stuff in there. He comes to the house, gets food.

And I tried to take the best care of him as I could. But it's, like, you know, it's time for him to step up and do some stuff 'cuz I can't get all this stuff done by myself. I've got two grown boys. This one's 37, he's 33 now. So they're old enough, you know, to start helping more about stuff besides making it harder.

THE COURT: I don't want to cut you off before you're finished so if you have anything else.

THE DEFENDANT: That's all I got right now.

My foot's been swelled up. I fell through my floor this year again for the third time. I had to go to the doctor with my foot yesterday.

THE COURT: Well, with regard to the issue of sentencing, as with any sentencing, I look to the factors that are set out in Section 3553(a) because I think that that sets out a very good paradigm for analyzing the different factors that should go into a sentencing consideration and I think several of those factors apply in this case.

I believe that the Court needs to look at the seriousness of the offense, how serious it was. Needs to look at, as the Government has emphasized, the factor of general deterrence. But

also needs to look at the factor that the defense has emphasized and that is the history and characteristics of Ms. Jamerson.

Mr. Foster's argument seems to entirely discount the concept of general deterrence referring to it as simply formulating a sentence to boost efficiency and I think that that entirely mischaracterizes what the law is with regard to the question of general deterrence.

And, that is, for the law to operate as it is intended, it must actually be applied. And to say that by applying the law, it's merely creating some sort of efficiency or convenience for law enforcement, for the Court, for the prosecution, is a pretty serious mischaracterization of what it is that we do in the justice system, including what defense attorneys need to be doing in the justice system. So I think that that mischaracterization is far afield of what we need to be addressing in this proceeding.

Whenever a custodian is appointed, that custodian needs to understand not only what his or her responsibilities are, but particularly to understand that there are consequences to failing in the discharge of those responsibilities. Because that appointment is something that's very important. It's much more important than it is to the efficiency of this Court or the efficiency of law enforcement. It's important to that particular defendant. And I think that that fact has been entirely missed by the argument made by defense counsel.

Here, in analyzing the seriousness of the offense, I see

factors that in a way pull in two different directions. On the one hand, I see the seriousness of the offense in that it appears to me that Ms. Jamerson gave up at a very early stage on trying to discharge her responsibilities, but at the same time I see that as being mitigated by the defendant's complete lack of cooperation with her with regard to her ability to discharge those responsibilities. So in that sense, I see the seriousness of the offense to be somewhat mitigated.

But going hand in hand with the general deterrence factor is fashioning a sentence that encourages respect for the law and that is the one aspect of the seriousness of the offense that I believe is present here that needs to be addressed. And, that is, in giving up to the degree she did on the -- discharging the responsibilities as custodian, Ms. Jamerson showed a certain disrespect for the law. Albeit somewhat mitigated by the lack of cooperation that she got from the defendant, who she was supposed to be supervising.

But I've taken into account the history and characteristics of the defendant, all of the factors that have been expressed by defense counsel. No criminal record, limited education, disability. All of those factors.

And even beyond that, taking into account the history and characteristics of the defendant in the degree to which a serious root of the problem here is the sheer disrespect that she received from her son, the defendant.

Taking all of those things into account, it is my determination that Ms. Jamerson, Connie Jamerson, is remanded to the Marshal to be imprisoned for a term of three days.

THE DEFENDANT: Please don't do that. Please don't. You know what was the most confusing before when this first started, the first time I had to be a custodian, they kept saying for me to call and call and call. Okay. I call, like, 15 people. I call the clerk at this court. This is what was most confusing. And this time -- I known all this before because she said that the -- my -- over him -- because when I go out the door, that I did not have to call back for anything else. The court from this place told me that.

I called the law before. They talked to me like I didn't have a lick of sense. Ma'am, I don't know what you're talking about. I called every -- I called eight or ten different ones and not one of them act like they had a clue. And they waited four days before they come pick him up.

THE COURT: Well, Ms. Jamerson, you need to consult with your attorney about any of those issues. I've heard all the evidence. We've been here for half a day now. I've taken into account everything that I know to take into account regarding this matter.

And under the circumstances of this case, I believe that that is a very mitigated sentence. It's a very short sentence considering all the facts and circumstances of this case. I've

declined to impose any sort of fine in light of your financial condition.

THE DEFENDANT:  I'll pay the fine.  I will come up with the money.  I will borrow it.

THE COURT:  Well, I've made the determination that I'm going to make and that concludes this matter.

Mr. Foster, is there anything else that needs to be addressed regarding this case?

MR. FOSTER:  If I may have a moment.

THE COURT:  You may.

(Attorney Foster conferring with Connie Jamerson briefly off the record at counsel table)

MR. FOSTER:  I believe Ms. Jamerson is intending to appeal and I would request release pending appeal pursuant to Section 3146.

THE COURT:  Mr. Gast, what says the Government as to that issue?

MR. GAST:  May I have just a moment?

THE COURT:  You may.

(Attorney Gast reviewing documents)

MR. GAST:  Okay.  Your Honor, the statute would be 3143, not 3146.  It would be under section b.

THE COURT:  Sub part b?

MR. GAST:  Correct.

THE COURT:  Yes.

MR. GAST: It first says they have to file the appeal, which -- but even if we ignore that for the moment and assume that that can be done with dispatch, there's -- subsection cap A and cap B. Cap A is there's clear and convincing evidence the person is not likely to flee or pose a danger. I'm satisfied that there's -- she's not likely to flee or pose a danger.

But B section is what would cause me concern for the fitness of release pending appeal. That the appeal is not for the purpose of delay and raises a substantial question of law or fact likely result in reversal or order for new trial or a sentence does not involve a term of imprisonment.

I don't think that standard can be met here. I can't imagine there would be a matter of law that would either shorten the sentence or likely to result in reversal. The courts are generally given a broad brush of discretion with respect to contempt issues.

So that seems unlikely, so it seems the only benefit would be to delay, so we would oppose that.

THE COURT: You don't think that Mr. Foster's argument with regard to Section 3143 and whether or not our procedures are faulty is a sufficient argument, that if he is correct, could result in a reversal of the determination by the Court of guilt?

MR. GAST: I think --

THE COURT: That would eliminate an element, wouldn't it?

MR. GAST: Excuse me. I'm sorry for interrupting.

THE COURT: Oh, no problem.

MR. GAST: I certainly agree if the Fourth Circuit adopted that argument, it would have that affect, but I don't think he's anywhere even close on that. So I think that argument borders on the meritless so I -- I think that under the standard, I think it would just be delaying the reporting.

(The Court reviewing documents)

THE COURT: Mr. Foster, what do you say in response?

MR. FOSTER: Just that the -- exactly where the Court was going with this. I think that the legal issue we raised is -- you know, obviously he described it as meritless. I find it is with merit. We understand the Court's ruling. I don't think courts ever make rulings that they don't think are legal.

That said, this particular issue, given that there is a statute authorizing bond pending trial, a separate statute that authorizes bond pending sentence and the two were never discussed, I think is something that is far from frivolous.

THE COURT: Well, what do you advocate in terms of whether or not there should be a bond and what the terms of that bond should be?

MR. FOSTER: Well, given Mr. Gast's seeming agreement that there is no danger to the community or flight risk, I don't see that there's any reason -- if the Court is going to allow her to have release at all -- that that release is not on her own recognizance.

She does own a home. Certainly she has nowhere to go,

for one thing, and I don't think anybody is going to run to avoid a three-day sentence.

THE COURT: I didn't think anybody would run to avoid a four-month sentence either.

MR. FOSTER: Fair point. Fair point.

MR. GAST: If I could add something, your Honor. I apologize for interjecting.

While I don't think she's a risk of flight in the traditional sense of she's going to run from the police, she has demonstrated a lack of respect for orders from the Court, number one, that this Court has found.

And number two, I don't know if her conditions have changed. For example, she was given a bond and them told to report or given a court date. If she claims again, I don't have a phone, I don't have this, I don't have that. I would want to hear evidence that those circumstances are different now and better and changed before trusting her on a bond.

THE COURT: Mr. Foster, do you have anything you want to say to that?

MR. FOSTER: I'm happy to give the Court the phone number with which I've been communicating with her. I can -- and the address is the same that was on the original order.

As a practical matter, the fact is there was a lot shorter delay of time between Mr. Jamerson's original release and his sentencing than there is likely to be in this case on appeal and

in -- and in the earlier shorter period of time because she does not have much money, she lost her access to a phone. So I can't guaranty it's not going to happen. I can tell the Court that she has a phone now that is working today and I am happy to provide the number.

THE COURT: Well, here's the way I look at things. I believe that Ms. Jamerson is not likely to flee or pose any danger to the safety of any other person or to the community. I do not -- I find that the appeal -- even though 3143(b) refers to an appeal having been filed -- but the statement that there would be an appeal is not for the purposes of delay. The whole question hinges on whether such appeal raises a substantial question of the law.

While I find -- Mr. Foster, I find your arguments -- obviously I didn't find them to be of merit because I didn't rule in your favor, but if the manner in which this Court is conducting detention hearings that involve a bond with a custodian, or for that matter, the manner in which this Court is conducting revocation hearings where someone -- where a convicted defendant seeks the opportunity to self report, if we're doing that wrong, I need to know about it. If we need to do things in a much more formalized way than what we do, then I suppose the Fourth Circuit will tell us.

So I'm inclined to allow the release of Ms. Jamerson pending that appeal. I'm a little bit uncomfortable with the fact that the appeal hasn't been filed, but I trust that that will be done posthaste.

I don't see any reason for Ms. Jamerson to be supervised by a probation officer under the circumstances and, therefore, I'll allow for her to be released on her own recognizance.

What that means, Ms. Jamerson, is I'm trusting you to abide by everything that might be required. And with the pendency of that appeal, you're going to go a long time without hearing anything. It's going to be like this case fell off the face of the earth to you. But you're going to need to keep in touch with Mr. Foster to make sure that you're up to date as to what's going on because that will be your responsibility.

THE DEFENDANT: Can I ask one question?

THE COURT: Well, in just a moment you can. This whole thing started where your son had just a four-month sentence on a revocation matter and it's turned into a massive falderal, including a new indictment for him. It's an enormous mess.

You sure don't want to create a new mess on top of that mess over a three-day sentence, a weekend at the county jail. You definitely don't want to do that. That would be the biggest mistake of your life. So please abide. Please do everything you can to make sure that you are fully apprised at all times as to what's going on with this case.

So you said you had a question. I'm not promising that I'll answer it, but you can ask it.

(Connie Jamerson conferring with Attorney Foster briefly at counsel table off the record)

THE DEFENDANT: I usually just write it down and I lost the thought of it sometimes.

THE COURT: If you think about it --

THE DEFENDANT: When he was on -- he's supposed to surrender on that day, okay. If he is not there at that 12 o'clock or 11 o'clock whatever time it was they said, like I said, I was overwhelmed of my grief of my husband and they had come -- they do not come there and pick him up that day when he got don't show up. That's what I don't understand.

THE COURT: Well, that's probably a question that's better posed to Mr. Foster than it is to me.

THE DEFENDANT: I just don't understand it.

MR. FOSTER: I'll talk to you about it.

THE COURT: With that -- is there anything else?

Well, Ms. Jamerson, even though we've already been discussing it, I will say it particularly and, that is, you have the right to appeal both my determination that you are guilty of criminal contempt as well as the sentence that I have imposed and that you may -- since you have been previously determined to be indigent, you may appeal at government expense.

If you want to appeal, you need to file that notice of appeal in written form with the clerk of this court. And you need to do it within 14 calendar days of this determination of your guilt.

However, in light of the fact of your release is based on

your appeal, I would urge you very strongly to make sure that that gets filed today to make sure that your release does not get revoked for failure to meet the condition of filing the appeal.

Do you understand your appeal rights the way I have explained them to you?

THE DEFENDANT: Yeah.

THE COURT: Mr. Gast, you had something you wanted to add?

MR. GAST: Just that you came very close to what I was going to request, but not quite.

I would ask the Court -- I know she has the right to 14 days to file the notice of appeal, and the Court strongly urged her to do it by 5 o'clock today. I would ask the Court if they would make that in the form of an order or else have to come in and show cause why her bond should not be revoked until such time as it's filed.

The only reason I'm being nit-picky about that is they could meet and discuss and decide it's not worth it since it's a three-day sentence. And if that's the case, I would not want this to fall into some category where it's off the calendar and then people don't notice it in 14 days so...

THE COURT: Under the statute, can I shorten that appeal period?

MR. GAST: Well, it wouldn't be shortening the appeal period, but what it would be doing is saying if you don't file it by

5 o'clock today, we're going to have a status hearing -- we can do it in the Magistrate Court, say, Friday so that -- because if they're not going to file it, then we need to reevaluate bond because one -- the filing has to precede this.

So I'm fine with the statement of intent, but they could, after this hearing is over, talk about and decide it's not worth it since it's a three-day...

THE COURT:  Well, what I will do is even though the appeal period is 14 days, the condition of the release under 3143(b) is conditioned upon the written notice of appeal being filed by 5 p.m. today.

MR. GAST:  Perfect.

THE COURT:  That way -- I mean, it doesn't cut off the opportunity to file an appeal thereafter, which can still be done, but the release would then need to be revisited presumably by some sort of hearing with Judge Metcalf tomorrow.  Is that sufficiently clear?

MR. FOSTER:  Yes.  I mean, I understand why you want it in the record, but I'm going to file it this afternoon.

THE COURT:  I trusted that you would, but I want to have the Ts crossed and the Is dotted.

Are there any other issues that we need to address as part of this?

Anything for the Government?

MR. GAST:  No, your Honor.  Thank you.

THE COURT:  Anything from the defendant?

MR. FOSTER:  No.

THE COURT:  Okay.  Very good.

With that, Marshal, please recess us it until further call.

(Hearing concluding at 1:26 p.m.)

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NORTH CAROLINA


CERTIFICATE OF OFFICIAL REPORTER


I, Michelle A. McGirr, RMR, CRR, CRC, Federal Official Court Reporter, in and for the United States District Court for the Western District of North Carolina, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and accurate transcript of my stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 19th day of March, 2025

/s/ Michelle A. McGirr
MICHELLE A. McGIRR
RMR, CRR, CRC
U.S. Official Court Reporter